# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

LAWRENCE GUZMAN,

      Defendant.

      Criminal Action
      No. 03-10038-GAO

**TRANSCRIPT OF SENTENCING**

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

United States District Court
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
October 24, 2003
10:00 a.m.

COPY

\* \* \* \* \* \*

SHELLY M. KILLIAN, CM
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 3510
Boston, MA  02210
(617) 737-7117

```
 1 APPEARANCES:

 2 For the Plaintiff:

 3 Peter Levitt
   United States Attorney's Office
 4 John Joseph Moakley Federal Courthouse
   1 Courthouse Way, Suite 9200
 5 Boston, Massachusetts  02210

 6 For the Defendant:

 7 Carl N. Donaldson, Esq.
   327 Summer Street
 8 Boston, Massachusetts  02110

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           P R O C E E D I N G S

2               (The following proceedings were held in open court

3       before the Honorable George A. O'Toole, Jr., United States

4       District Judge, United States District Court, District of

5       Massachusetts, at the John J. Moakley United States Courthouse,

6       1 Courthouse Way, Boston, Massachusetts, on October 24, 2003.

7               The defendant, Lawrence Guzman, is present with

8       counsel.  Assistant United States Attorney Peter Levitt is

9       present.)

10              THE CLERK:  All rise.  Criminal 03-10038, United

11      States versus Lawrence Guzman.

12              MR. LEVITT:  Good morning, your Honor.  Peter

13      Levitt on behalf of the United States.

14              MR. DONALDSON:  Good morning, your Honor.  Carl

15      Donaldson on behalf of Mr. Lawrence Guzman.

16              THE COURT:  Mr. Guzman appears this morning for

17      sentencing on his conviction, one count of distribution of

18      cocaine, violation of 21 U.S. Code Section 841(a)(1) and 18

19      U.S. Code Section 2.  I have a final presentence report.  It's

20      been submitted by the probation office, and I gather the

21      parties have had an opportunity to review the report in the

22      final form that it's been submitted?

23              MR. LEVITT:  That's correct, your Honor.

24              MR. DONALDSON:  Yes, your Honor.

25              THE COURT:  In addition, I have a motion from the

1     government, a memorandum on sentencing from the government, and

2     a memorandum from the defendant with respect to sentencing.  I

3     think that completes the papers that I should have.

4                 MR. DONALDSON:  Yes, your Honor.

5                 MR. LEVITT:  Yes, your Honor.

6                 THE COURT:  As I've reviewed the papers, it appears

7     to me that there is no controversy between the parties as to

8     the guideline range, and the subject is what extent of

9     departure, if any, ought to be provided.  Is that a fair

10    statement?

11                MR. LEVITT:  That's correct, your Honor.

12                MR. DONALDSON:  Yes, your Honor.  That's fine.

13                THE COURT:  Then I think we might as well get right

14    to the main issue.  And let me just say I have reviewed the

15    PSR.  I adopt the offense conduct statement that's set forth

16    therein, and on the basis of that I conclude that the career

17    offender guideline produces -- taking account of a three-level

18    adjustment of acceptance of responsibility -- a level 29 and a

19    criminal history category 6, which will yield a presumptive

20    guideline range of 151 to 188 months.

21                Mr. Levitt, the government's motion?

22                MR. LEVITT:  Thank you, your Honor.  The government

23    recommends a 20 percent reduction from the mid range of the

24    guideline provision that results in a term of imprisonment of

25    133 months.  There's really -- the government's position is

1    laid out, I think, pretty well in the motion for a downward

2    departure.  I'll just highlight a few of the points.

3            There are two considerations from the government's

4    perspective.  One is the fact that the defendant did provide

5    cooperation.  The defendant has been a government cooperating

6    witness since approximately 1999.  His cooperation -- he

7    assisted in his cooperation -- assisted the FBI in arresting

8    four individuals, two of whom pled guilty, two of whom were

9    convicted at trial.  The defendant testified at trial.

10           The defendant also provided corroborating

11   incrimination sentencing with respect to drug weight with

12   respect to five other individuals.  The individuals that the

13   defendant cooperated against were gang members.  They're

14   dangerous people.  The defendant did put himself at risk in

15   cooperating.  That's the reason for the 5K1.

16           The reason that the 5K1 is 20 percent as opposed to

17   more is that the defendant, while a cooperating witness for the

18   government, unbeknownst to the government was dealing drugs.

19   He also was involved in an armed robbery.  He repeatedly lied

20   to the FBI.  He repeatedly lied to the U.S. Attorney's Office.

21   He admitted that he lied about his own drug use at

22   sentencing -- at the sentencing hearings that he was engaged in

23   with respect to the LGD case -- that's a gang case -- all of

24   which the government has disclosed to various defense counsel.

25           The -- in this respect, really the defendant broke

1    a sacred trust between the government and its cooperating

2    witnesses.  This was his drug -- the fact that he was dealing

3    drugs and the robbery was disclosed to the government by a

4    defendant that he cooperated against.  The government, to

5    confirm whether this was the case or not, tried to make a

6    controlled buy from the defendant and was easily able to do

7    it.  And the defendant bragged during the controlled buy about

8    being able to get the undercover state trooper as much cocaine

9    as he wanted.

10        So the government, sort of balancing both of these

11   considerations, has made a recommendation that is significantly

12   less than what it would be if the defendant had simply done

13   what he was supposed to do, done what he agreed to do, which

14   was to cooperate and not to violate the law while he was

15   cooperating.  So the government's recommendation again is 133

16   months.  Thank you.

17        THE COURT:  When you say it's a reduction of 20

18   percent, you're measuring from the mid point of the range, not

19   from the low end?

20        MR. LEVITT:  That's correct, your Honor.

21        THE COURT:  Mr. Donaldson?

22        MR. DONALDSON:  Good morning, your Honor.  If it

23   pleases the Court, I have respectfully requested that he have a

24   departure from the guidelines based upon several issues, three

25   of which I've pointed out in my memorandum in aid of

1  sentencing.

2         The first, your Honor, is basically the fact that

3  based upon the information that we have and based upon the

4  basic evidence that also came out in the presentence report,

5  indicates that Mr. Guzman was imperfectly entrapped into this

6  sale that brings him before the Court today.  And I believe

7  that the facts of the case law fit perfectly within that

8  category.

9         Mr. Guzman was introduced -- well, Mr. Guzman

10 introduced this specific confidential informant to the

11 government and had him become a confidential informant

12 himself.  Not only did he introduce him, but he had been a

13 long-time friend because the mother of his children was related

14 to the confidential informant by way of his mother's -- the

15 children's mother's sister, and they were boyfriend and

16 girlfriend.  So he had a close and confidential relationship

17 with him.

18        As pointed out, your Honor, in the cases that is

19 one of the things where it appears that there may have been

20 some overreaching by the government with respect to getting

21 this particular confidential informant to solicit Mr. Guzman to

22 sell drugs to an undercover government agent.

23        Your Honor, the other issue is the fact that

24 Mr. Guzman was considered by the street gangs and -- by the

25 street gangs as a snitch or a person who has turned on the

1    gangs.  And he broke some codes and some rules of the street,

2    which is to turn in evidence on someone else and to also

3    testify.

4              In fact, while he was here testifying, he had

5    received at least one threat in the mail by an individual who

6    basically says, you know, I know where you are.  In fact, you

7    know, when they say that, you know, the Bureau of Prisons are

8    adequately set up to remedy this situation.  He was, in fact,

9    brought up here on the same bus with the individuals that he

10   was testifying against from Plymouth County Correctional

11   Facility.  So I'm not sure that there is a safe way.  And the

12   fact that the gangs are so heavily entrenched in the Bureau of

13   Prisons, it would appear to me that it would be not a facility

14   in these particular areas that would basically keep Mr. Guzman

15   from any unreasonable harm.  Of course, he's always going to

16   have the threat of some form of victimization.

17             Your Honor, and I do -- I do apologize.  I did have

18   a typo there.  I put that he aided in 46 individuals.  That's

19   not correct.  My brother, he mentions nine.  I believe it's

20   more than nine.  The presentence reports states I think 17 or

21   18 individuals, but I do know that he did at least testify

22   against two.  I watched one full testimony against that

23   individual.  The last one, which was in May, that was the time

24   that he was threatened.  Those are the times that he came up

25   here on the same bus from the correctional department or from

1  the prison, from Plymouth County Department of Corrections with

2  the same individual.  He was harassed on the bus on the way up

3  here, he tells me, and on the way back.

4            Lastly, your Honor, I would indicate that his

5  criminal history category overrepresents the crimes that he

6  is -- has pled guilty for.  And the category clearly

7  overrepresents his activity -- his past behavior.  Because of

8  the guidelines, he is a level 29, category 6.  Mr. Guzman was

9  involved in two threats to his girlfriend and one to her

10  boyfriend.  One was November of 2001 and one was December of

11  2001.  Both of those cases were combined and he pled those

12  cases together.

13            He is doing concurrent time for those cases

14  together.  When I say concurrent time, he basically received a

15  probation sentence.  That probation sentence was basically a

16  very, very low level probation sentence, although it was -- he

17  was on probation until the year 2004.  The low level probation

18  sentence, one of which he did not have to report to probation,

19  so it was unsupervised probation.  The other one he spent

20  approximately 27 days in jail.

21            Your Honor, there is no -- there is no issue, you

22  know, that he would commit those crimes again.  He was -- he

23  basically caught himself out of his jealousy.  He basically

24  caught himself from doing that.  He kept himself respectful

25  after the last time.  He knew that he was working for the

1     government.  He tried to remain respectful to the government
2     and to, you know, the court system with respect to his promise
3     not to abuse or not to harass or not to threaten his children's
4     mother.

5            Now, the government indicates that Mr. Guzman
6     abused his trust.  Mr. Guzman tells me that for the most part
7     the government knew that his ability to infiltrate these gangs
8     required him to have some level of trust with the gangs
9     himself.  Some of those levels of trust will require him to do
10    some things that he has told me, and basic street knowledge
11    with respect to the gangs is some form of camaraderie.

12           Generally, when you infiltrate these gangs, when
13    you have some type of relationship with these gang members,
14    your Honor, guys get together, they talk, they start to smoke
15    marijuana or they do drugs together.  Mr. Guzman indicates that
16    there was no way that they would trust him if he didn't get
17    high with them.  And he indicates that the government knew that
18    he was getting high with them.

19           Now, I'm not sure to what level anyone knew that he
20    was getting high with them, with the gang members, but what I
21    can say is that to some degree there, you know, there's a close
22    relationship with the government and Mr. Guzman, and then there
23    is a close relationship with Mr. Guzman and the gang members.
24    It's strong knowledge that in order to hang out with some of
25    these gang members, you do have to have some trust.

1         One of the topics or one of the key marks that will

2  set them off is why doesn't this guy -- you know, he's

3  different.  He's not getting high.  Can we trust him?  He's not

4  touching any of this stuff.  Mr. Guzman feels that that is one

5  of the reasons why he had to do it.  He was predisposed to do

6  drugs because he had done drugs in the past, and he caught

7  himself doing drugs.

8         With respect to a breach -- in breaching this

9  trust, your Honor, that's the only time that he felt that he

10  breached any trust.  He indicates that he had never been

11  selling drugs.  In fact, if it was true that he was selling

12  drugs and it was known on the streets that he was selling

13  drugs, it would have been a lot easier and a lot cleaner and a

14  lot safer for the government to get someone else to get him to

15  serve as someone other than a confidential friend, especially a

16  friend that he used or introduced to the government himself.

17  There was an area of trust there.

18         Mr. Guzman tells me that the reason why he did

19  it -- one of the reasons why he did it was because he thought

20  that this is somebody that they could set up later and provide

21  information to the government.  In fact, I don't know if it's

22  been brought out by my brother, but Mr. Guzman started working

23  with the government in 1999.  He was told shortly after a

24  couple times he gave information to the government that he

25  didn't really have to do it anymore.  But he decided to

1    continue to help the government because he wanted the
2    government to understand that he didn't appreciate all the drug
3    activity.

4        In fact, where he lived there were people who were
5    selling drugs right across the street from him, and his
6    children were outside playing, cars driving up.  So he wanted
7    to clean up his neighborhood.  He wanted to basically clean up
8    the city.  So he continued on, even though the government told
9    him they didn't need him to do it anymore.  He continued to
10   help the government.  And then, you know, within three months
11   of his last trial that he was going to testify with, he was
12   basically set up by the government by one of his friends to
13   sell drugs to an undercover officer.

14       Now, Mr. Guzman tells me that he had -- was
15   expecting money from the government, that he hadn't received
16   any money for some period of time, and that one of the other
17   reasons that he did it is because Valentine's Day was coming
18   by.  He did not have any money and he knew that he could make
19   some money from that and that's one of the other reasons why he
20   did it.

21       His confidential friend told him that this is a
22   person that he needed to have serviced.  He needed to have him
23   serviced that day.  There was no way that they could let this
24   guy get away.  This guy was a big spender and that he had
25   nobody that he could use to service him at this time.

1    Mr. Guzman was actually on his way to spend time with his
2    children, and after the pressure and the overall continued
3    request that his friend asked him to service this gentleman,
4    who ended up being an undercover officer for the government,
5    Mr. Guzman relented and said that he would.
6         Based upon all that information, your Honor, I
7    would suggest that Mr. Guzman -- and looking at the totality of
8    the circumstances -- should not be a category 6, level 29 and
9    that this Court has the authority to depart from the guidelines
10   and that they should to provide justice with respect to
11   Mr. Guzman in his sentencing.  Thank you.
12        THE COURT:  Mr. Levitt, do you want to respond
13   briefly?
14        MR. LEVITT:  Yes, briefly, your Honor.  The
15   government's not -- didn't prosecute Mr. Guzman for using drugs
16   with gang members.  The government did not reduce its
17   substantial assistance recommendation for the defendant using
18   drugs with gang members.
19        The defendant prosecuted the defendant -- the
20   government prosecuted the defendant for selling drugs.  The
21   information the government got from two defendants was that
22   Mr. Guzman was selling drugs on the streets for money, not
23   using drugs.  The government was able to after the second piece
24   of information the government got with respect to that, the
25   government was able to make a buy from the defendant within two

1    days.   That's how easy it was because -- and the government
2    submits that it was easy because the defendant was on the
3    streets actively selling drugs.

4            The defendant also, again, was involved in an armed
5    robbery of a drug dealer while he was acting as a cooperating
6    witness.   The defendant suggests that the reason he was
7    cooperating was to try to clean up the streets of Lawrence.
8    The defendant was paid $11,000 for cooperating with the
9    government.   The defendant also had a -- got assistance from
10   the government in connection with state cases he had.   The
11   government brought to the District Attorney's office his
12   intention of his cooperation.   The marijuana case was quashed.
13   He also got his license back and got no jail time on the
14   threats and assault and battery.

15           The last thing with respect to the criminal history
16   category issues -- there are actually two last points.   The
17   defendant has three predicate career offender convictions, from
18   June of '98, December '01 and February '02.   Two of those
19   involved a gun.   One was assault and battery with a dangerous
20   weapon, a handgun.   One was threatening to commit murder.   One
21   was threatening and assault and battery in which he showed a
22   gun.   The criminal history category clearly meets the career
23   offender definitions.

24           With respect to the issue of the defendant's
25   protection in prison, the government -- the Bureau of Prisons

1   does this all the time.  It protects snitches.  It segregates

2   them.  I'm going to ask Mr. Donaldson at the conclusion of this

3   hearing to provide me with a list of all of the individuals

4   that he believes the defendant should be segregated from, and

5   we'll provide that to the Bureau of Prisons.  That's done all

6   the time.  Thank you, your Honor.

7           THE COURT:  Mr. Guzman -- Mr. Donaldson, if you

8   have something else -- I was going to invite Mr. Guzman to say

9   anything he wanted, but go ahead and go first.

10          MR. DONALDSON:  I would only indicate that the

11  three state cases that Mr. Guzman pled guilty to, those -- of

12  those three cases, he pled guilty to one of them.  He was

13  assisted by counsel.  The other two he was not, in fact,

14  assisted by counsel.

15          In fact, one of the agents for the state, police

16  officer -- Detective Brooks from the Lawrence Police Department

17  went into court with Mr. Guzman.  Mr. Guzman waived his right

18  to counsel and he pled to sufficient facts.  And I took a

19  strong, close look at the transcript.  The transcript did not

20  indicate that Mr. Guzman had a correct and qualified

21  Massachusetts Rules, criminal rules, 12(B)(5) colloquy

22  hearing.  I brought that to the Court's attention by a motion

23  to reopen the case, and I gave the transcript to the Court.

24          In the transcript, your Honor, the motion -- the

25  statements had -- they were extremely short of what is

1    required.  Massachusetts requires a probing of the mind as well
2    as all the other Courts, your Honor.  And the Court denied that
3    motion.  I am at this time, once I get the tape transcript,
4    also filing to have that case reviewed.

5              And I would just say that given those
6    circumstances, your Honor, I don't believe that Mr. Guzman
7    wants -- once the single justice reviews it, I don't believe
8    that Mr. Guzman would be in that category anyway because those
9    cases would be reopened.  There is not -- it's just one witness
10   against the other.  There is really not any corroborating
11   witnesses who are going to testify either for Mr. Guzman or
12   against Mr. Guzman.  And I believe that Mr. Guzman will prevail
13   on those cases; that is, if the Commonwealth decides to bring
14   those cases after the case gets reopened.

15             THE COURT:  Mr. Guzman, you have the opportunity to
16   say something now.  You don't have to if you don't wish to, but
17   you have the chance to do so if you wish.

18             THE DEFENDANT:  Your Honor, I'd like to say I spent
19   three and a half to four years trying to work for the FBI,
20   collaboration to take down gangs.  I do admit I had a substance
21   abuse problem and I did relapse during occasions of buying,
22   selling drugs.  And also I don't see how I could fall into a
23   category of a career criminal, sir, when all I've done for four
24   years is try to work for the FBI and do the right thing.

25             I know I did fall.  I did fall and I'm trying to

1 clear myself of that. I did use drugs and I did plead guilty
2 to selling drugs to an undercover, but I feel I was entrapped.
3 I also feel, your Honor, that I haven't had one opportunity to
4 express myself in this whole case. I feel I have been wrongly,
5 wrongly, wrongly done by the people I worked for, including the
6 FBI agents and the government.

7 I have two beautiful kids that are waiting for me.
8 The most I've done is just threaten people. I never harmed
9 anybody. I never hurt anyone. The things I have done, I have
10 done wrong and I do admit to them, but I don't feel I should
11 fall under career criminal category.

12 I put my life in danger for my government several
13 times, my family's life and my children's life. To this day
14 I'm still in danger. I'm marked. I'm everything, when I'm in
15 prison and out there. I have surpassed not one but two gangs.
16 I've testified against one and miraculously happened to put
17 efforts toward another bringing them down. I sat in this Court
18 last year and testified against the LGD gang and now this year
19 against the Latin Outlaws.

20 And I throw myself on the mercy of the Court today
21 and hope that you can see both my way of life on the street and
22 in respect to what I have done for the government. Thank you,
23 your Honor.

24 MR. DONALDSON: Your Honor, Mr. Guzman's father
25 indicated that he would also like to address the Court.

1          THE COURT:  All right.

2          MR. GUZMAN:  Sorry.  This is my first time in

3     court.  Please give me a couple seconds.

4          THE COURT:  Take your time.

5          MR. GUZMAN:  I know my son broke the law.  He had

6     to pay for what he's doing.  I know he not do nothing right.  I

7     fight with him.  I try to help but they go with the people,

8     take away from me.  I tried to send him out to the Army but the

9     people keep it going every day.  I try to get out.  All the

10    time he tell me, Pa, you don't know what you say.  I never go

11    to jail because I do -- because I do a lot of good deal for the

12    person, for the government person.  What my son doing is not

13    casuality (sic).  It's abuse of the power.  He use an innocent

14    person.

15          Know what I say is what I say and the Court in the

16    record why he have a problem when he got framed, he go to the

17    court.  They broke -- never let it alone.  The government never

18    let he alone in the court.  He go with Laurie.  Tell him what

19    he doing, why he do it, why he do it, why he go to the court

20    because he need -- he live in Lawrence.  They declared guilty.

21          Why one officer law have to go one criminal person

22    in the court?  And he tell him why he do it because somebody

23    tell him you say the truth, you be free.  That's what he say.

24    He had to say the truth for only the -- the other side have to

25    say the truth, too.

1    My son misabuse of the power. For four year when
2    he catch the first time with drug, he supposed to use of the
3    law, send it out to the jail. Today my son was a different
4    person but he go out a boy, a criminal, like you call the
5    people here. He bailed it out. Twenty-four seven he called my
6    house, hey, yo, yo home? What's really the law? They won't
7    see this world, this nation like example. For me I don't see
8    that way because I suffer. I fight for my son to save him, and
9    all the time somebody take it away from me. I know my son.
10   But the government take it away from me to do the job.

11   I feel proud that he do in Lawrence, take him off
12   the gang. Why the FBI and the police get a good pay and not do
13   their job? No, they use an innocent person. They use an
14   innocent person. Now, they use him. They don't need him. He
15   used. I can't hang everything because he know inside out what
16   he did, but he was another person in catching the -- he was a
17   long time in the street because the government know what that
18   really person is.

19   He say when I explain I only selling drug for a
20   couple of months. He's a liar. Laurie sell drug for a long
21   time and the FBI and the police know he's selling drug because
22   if you are not selling drug, he never be working with the FBI.
23   This is a reality. The police they know he selling drug. Why
24   he let it go? Why? Why he not catch it and put in the jail
25   where he supposed to be? No. He wait to finger the -- he

1  wanted to finger to put him in the jail. I lie or seek to tell
2  the truth. That's what it's truth. Absolutely everybody got a
3  record.

4      I'm poor guy but I never broke the law. Even for
5  being down low. I pay my taxes for 35 years. I buy a home. I
6  work hard to give a decent house. I tried to send to the
7  Marine. I send to the Army. I tried to send it out to
8  recuperation group, but all the time the telephone ring, take
9  it away. He give him morning, every Friday, he give him money
10  to him to buy drug. Sometime he cried to his mother say, Ma,
11  pray for me because I want to go some party in Haverhill for
12  that people. I don't know say I want to return.

13      Sometime he come with one big picture, the one guy
14  help because the government force him to do it. Now, after the
15  government finished and put the gang away, now he's a thorn for
16  him. The government know he selling drug for a long time. The
17  government know he broke the law. The government know what he
18  doing before now. They catch him with drug and bring it over
19  here. Everybody know. Why now? Because this is a poor guy.
20  I'm poor man. I don't have the money to defend myself.

21      No, I have a couple dollar for my retirement. I'm 58
22  years old. I don't have no more power to work, but I work very
23  decent to grow a decent house. He never see me drink a beer.
24  I pay for his school. I tried to do my best for my daughter
25  for college. The old house is for me, for my family, for my

1    grandchildren.

2           Why you call it crime with Laurie.  What do people

3    do to Laurie?  How do we want to call it?  Abuse of the power

4    or crime?  I think it is not fair what he doing to Laurie.

5    Even he tried to open the case on Laurie.  You know what a D.A.

6    doing when he get out of the jail?  The court, oh, I do good.

7    You know why?  Because he know Laurie.  He know Laurie.  He

8    know Laurie.  He open the case easy because really.  Brooke

9    tell Laurie you have to declare guilty, that way he can take it

10   away and come back to the street.

11          Your Honor, I don't know how to speak very clear,

12   but I speak it from my heart.  You see, I haven't the money to

13   defend Laurie.  You do whatever you can.  I do it.  But is it

14   powerful people against Laurie.  Who it is, no.  Because Laurie

15   do good job for the society.  Laurie put a lot of criminal away

16   with criminal.  The police, the FBI, no one want to do it.

17   Laurie he sell drug for the FBI.  He do everything.  You know,

18   this is the best city in the world.  Every nation look at

19   America to take example, but what happens in this case go in

20   the public?  If I have the money, this is my way, get to the

21   public because maybe he no want to say, maybe I don't say, but

22   maybe other people, other boy, other family he want to be.

23   This is my world.  Sorry my English but --

24               THE COURT:  All right.  Thank you, Mr. Guzman.

25               MR. GUZMAN:  Yes.

1          THE COURT:  Well, this is an unusual case, I think
2     in various respects, including the step away from the
3     government's perspective of recognizing the assistance and yet
4     prosecuting the offense creates an interesting tension.  I will
5     grant the government's 5K1 motion, and I think it's probably
6     appropriate to select a reduction factor that reflects the
7     criminal activity that is the root of the conviction here, that
8     is, a lesser one than would normally be awarded.

9          On the other hand, I have to agree that the -- in
10    this -- in the particular circumstances of this case, the
11    enhancement that is worked by the application of the career
12    offender guideline is an enormous one given what would be the
13    offense level if that had not happened.  Apart from whether
14    anything happens with the Lawrence District Court, assuming the
15    validity of those, which I do because they are valid at this
16    stage anyway, the offense level would have been under what the
17    non-career offender computation would have been.  I believe, a
18    level 12, category three, which is 15 to 21 months, which is a
19    vast difference from what the career offender is.

20         So the question, I think, presents itself whether
21    the criminal history, which leads to the application of the
22    career offender guideline, is the kind of criminal history that
23    the guideline authors had in mind when they made that degree of
24    enhancement.  And I don't think it is.  It seems to me that a
25    multiple of ten at the bottom end is -- I don't say this simply

```
 1    as a mathematical matter, but it just gives an idea of the
 2    proportionate supercharging that gets done by the offender
 3    guideline.
 4            In some cases, you can easily see the pattern in
 5    the criminal history that you can, I guess, recognize that the
 6    enhancement is appropriate and can be justified.  I recognize
 7    that the criminal history includes the use of weapons, the
 8    carrying of weapons anyway, and threats which if carried out
 9    would be very serious crimes.  I note that even in the Lawrence
10    District Court, though, where the primary events were played
11    out, the disposition is on the light side.
12            Having sat in the Massachusetts District Courts, I
13    know that at times unsupervised probation is a disposition but
14    it is not a common one, at least it wasn't in my experience.
15    And it's unusual, I think, that an unsupervised probation would
16    be the response to a situation where there seemed to be a
17    threat of the use of a weapon.  Now, I don't know what went
18    through the sentencing judge's mind in those cases, but I have
19    a record which the signals point downward rather than upward.
20            So I think that calls for a further departure than
21    is requested by the government.  Whether this is a -- well,
22    whether I need authority to depart once I departed, I don't
23    know.  It may be that we're simply debating the extent of the
24    departure under 5K1, although I guess I'm frank to say that I
25    would not, if I were considering only substantial assistance, I
```

1   would not depart as far as I will depart.

2            So analytically, I'm not sure how it can be done.

3   So I guess I should say that I think that the criminal history

4   produced by the career offender overstates the criminal history

5   in this case.  I don't think that means going back to the

6   unenhanced guideline range.

7            PROBATION OFFICER:  Your Honor, I was just going to

8   comment that there's a specific guideline provision 3(A)1.1 to

9   give the Court authority to depart on the basis of

10  overstatement of criminal --

11           THE COURT:  I'm aware of that.  Thank you.

12           I guess my point is I'm not sure whether I have to

13  invoke that as a strict matter when I've already departed from

14  the range for another reason and we're debating the extent of

15  the departure.  It may be that since I have said that, I will

16  not depart as far as I will only because of the substantial

17  assistance, maybe I do have to.  So I appreciate you pointing

18  that out.

19           But, as I was saying -- so I'm not going to ignore

20  the career offender.  I think there should be some

21  enhancement.  And I think that under all the circumstances a

22  just sentence in this case would be one -- I would depart

23  from -- I'll stay mechanically within the table and depart from

24  the level 29 in category 6 to a level 19 in category 6, which

25  produces a guideline range of 63 to 78 months, and impose a

1   sentence at the low end of that range for 63 months.  That's

2   more than five years, and I think under the circumstances,

3   that's an appropriate sentence in this case.

4           So, Mr. Guzman, if you'd stand, please.

5           Upon your conviction of this offense and pursuant

6   to the Sentencing Reform Act of 1984, it is the judgment of

7   this Court that you be and you hereby are committed to the

8   custody of the Bureau of Prisons to be imprisoned for a term of

9   63 months.  I will make a recommendation that you be considered

10  for participation in the 500-hour comprehensive drug treatment

11  program.  I would also recommend that you be considered for

12  participation in an anger management program, if offered, at

13  the Bureau of Prisons facility to which you have been

14  assigned.

15          Upon your release from imprisonment, you shall be

16  placed on supervised release for a term of three years.  Within

17  72 hours of your release from the custody of the Bureau of

18  Prisons, you shall report in person to the district to which

19  you have been released.

20          While you're on supervised release, you shall not

21  commit another federal, state or local crime.  You shall

22  refrain from the unlawful use of a controlled substance and

23  shall submit to a drug test within 15 days of your release from

24  imprisonment and at least two periodic drug tests thereafter as

25  may be directed by the probation office.

1     You shall comply with all the standard conditions
2   that pertain to the status of supervised release.  Those
3   standard conditions are set forth in the sentencing guidelines
4   at section 5D1.3(c) and they're incorporated by reference.  You
5   shall comply, in addition, with the following special
6   conditions:  You're prohibited from possessing a firearm or
7   other dangerous weapon.  During your supervised release, you
8   shall participate in any program for substance abuse, treatment
9   or counseling as you may be directed to participate in by your
10  probation officer, which program may include random testing to
11  determine whether you have reverted to the use of alcohol or
12  drugs.  You shall be required to contribute to the cost of
13  service for such treatment based on your ability to pay or on
14  the availability of third-party reimbursement.  You are to
15  refrain from the consumption of alcoholic beverages during the
16  course of your substance abuse treatment.
17          I will not impose a monetary fine.  There is in
18  addition to the penalties announced a mandatory special
19  assessment in the sum of $100 which shall be due forthwith.
20          THE COURT:  All right, Phil.
21          THE CLERK:  Marshal, the defendant is now in
22  custody.  You have the right to appeal.  You have ten days to
23  file.  If you cannot afford an attorney, we will appoint an
24  attorney for you.  Mr. Marshal, the defendant is now in your
25  custody.

```
 1              (Court adjourned, 10:50 a.m.)

 2

 3                   - - - - - - -

 4                   CERTIFICATION

 5         I certify that the foregoing is a correct

 6    transcript of the record of proceedings in the above-entitled

 7    matter to the best of my skill and ability.

 8

 9

10

11    _____      __12/15/04_____

12    Shelly M. Killian            Date

13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```